UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TARA L. NORDIN,                          )
                                         )
        Plaintiff,                       )
                                         )
    v.                                   )        Case No. 4:11-CV-1893-JAR
                                         )
CAROLYN COLVIN,                          )
ACTING COMMISSIONER OF SOCIAL            )
SECURITY,                                )
                                         )
        Defendant.[1]                    )
                                         )

MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of

Social Security's final decision denying Tara Nordin's ("Nordin") application for disability

insurance benefits pursuant to 42 U.S.C. § 423 and supplemental security income ("SSI") under

the Social Security Act, 42 U.S.C. § 1382.  Nordin alleges disability due to bipolar disorder,

anxiety disorder, depression, post-traumatic stress disorder ("PTSD"), and sleep.  (Tr. 265.)

I.      Background

On December 4, 2009, Nordin completed her application for disability insurance and SSI

benefits.    (Tr. 155-167.)   The Social Security Administration ("SSA") denied Nordin's

application for benefits and she filed a timely request for a hearing before an Administrative Law

Judge ("ALJ").  (Tr. 77-78, 95-96.)  The SSA granted Nordin's request and a hearing was held

on October 28, 2010.  (Tr. 35-72, 107-112.)  The ALJ issued a written decision on January 5,

---

[1] **Error! Main Document Only.**Carolyn W. Colvin became the Acting Commissioner of Social
Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit. No further
action need be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

2011, upholding the denial of benefits. (Tr. 15-27.)   Nordin requested a review of the ALJ's decision by the Appeals Council.  (Tr. 8-11.)  On August 30, 2011, the Appeals Council denied Nordin's request for review.  (Tr. 1-5.)  The decision of the ALJ thus stands as the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Nordin filed this appeal on October 31, 2011.  [Doc. 1].  The Commissioner filed an Answer.  [Doc. 10]  Nordin filed a Brief in Support of her Complaint.  [Doc. 17].  The Commissioner filed a Brief in Support of the Answer.  [Doc. 22].

## II.    Decision of the ALJ

The ALJ determined that Nordin met the insured status requirements of the Social Security Act through December 31, 2014.  (Tr. 17.)  The ALJ found that Nordin has not engaged in substantial gainful activity since July 6, 2006, the alleged onset date of disability.  *Id.*  The ALJ determined that Nordin has the severe impairments of bipolar disorder, major depressive disorder, generalized anxiety disorder, borderline personality disorder, posttraumatic stress disorder ("PTSD"), and insomnia.  *Id.*  However, considering all of the evidence, the ALJ found that Nordin did not have any impairments or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19.) The ALJ found that Nordin had the residual functional capacity ("RFC") to perform light work, except she is limited to simple repetitive tasks and occasional contact with the public and coworkers.  (Tr. 21.)  The ALJ also determined that while Nordin is unable to perform any past relevant work, there are jobs that exist in significant numbers in the national economy that Nordin can perform.  (Tr. 25.)  Finally, the ALJ concluded that Nordin has not been under a disability, as defined in the Social Security Act, from July 6, 2006 through the date of the decision.  (Tr. 26.)

Nordin appeals contending that the ALJ failed to find the Plaintiff's degenerative sacroiliac disease[2] a severe impairment, as well as consider the effects of any non-severe impairments.  Nordin also asserts that the ALJ improperly gave weight to a medical expert while affording little weight to the Plaintiff's own treating physicians.  The Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

## III.   Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A.   Hearing Testimony

#### 1.   Nordin's Testimony

Nordin testified as follows.  Nordin graduated from high school and was in special education for reading when she was in school.  (Tr. 43.)  Nordin attended Missouri College for two weeks to study Medical Assisting, but it was too hard emotionally and physically.  (Tr. 44.)  She has not had any other vocational training nor has she served in the military.  *Id.*  She lives with her fiancé and her two children, ages six and seven.  (Tr. 62.)  She gave her youngest child up for adoption.  (Tr. 65.)

Nordin currently works five and one half hours per day, five days per week.  (Tr. 44.)  She assists an elderly woman with bathing, cooking, doctor visits, grocery shopping, and cleaning.  *Id.*  Her relationship with her client is good, because her client has the same mental problems as Nordin, so she is understanding of Nordin's mood swings.  (Tr. 59.)  Her client gets aggravated when Nordin misses work or is late.  *Id.*  Nordin is supposed to work from 8:30 a.m. until 2:00 p.m., but normally arrives at work at 9:30 a.m. or 10:00 a.m.  (Tr. 60.)  She probably

---

[2] "Sacroiliac disease is high-impact trauma to the sacroiliac joint that can cause death, or bone and nerve damage. Gale Encyclopedia of Medicine (2008), http://medical-dictionary.thefreedictionary.com/sacroiliac+disease, last visited March 20, 2013.  The sacroiliac joint "is a strong weight bearing synovial joint between the ilium and sacrum bones of the pelvis.  The bones are held in place and allowed limited movements by a system of sacroiliac ligaments." *Id.*

missed one day per month from work, before she started doing better.  (Tr. 60-61.)  Her client fired her once before and re-hired her.  (Tr. 60.)  Nordin usually schedules her client's doctor's appointments for late morning.  (Tr. 61.)  Between the time she arrives at work around 9:30 a.m. and her client wakes up at noon, Nordin empties the port-a-potty, gives the client her morning pills, fills the client's water glasses, and then goes to bed.  (Tr. 63.)  Her client has a spare bedroom so Nordin just goes to rest in there until the client wakes up.  *Id.*

Prior to her current position, she worked for a man who was a quadriplegic.  (Tr. 45.)  He worked at vocational rehabilitation and Nordin's job was to assist him with his daily work at his job and to clean his room at his home.  *Id.*  Nordin had several other jobs during the past fifteen years as a day care teacher; scheduler at a car dealership; imaging clerk at a medical center; worker for a doctor's office; a hostess, cook, server, and assistant manager at restaurants; and cashier at a retail store.  (Tr. 51.)  Nordin was fired from almost all of these jobs.  She was fired for being late, leaving early, not clocking out for breaks, not getting along with others, attempting suicide at work, not doing what was asked of her, her boyfriend causing problems, not being good at her job, and not being what they were looking for.  (Tr. 45-51.)  Nordin quit her job at Dairy Queen because Dairy Queen was going to deduct the amount of money taken in a robbery from her paycheck, and she could not work at Outback because it was too hard on her physically.  (Tr. 49-50.)

Nordin testified that she is unable to work due to depression, bipolar disorder, and lower back pain.  (Tr. 51-52.)  The pain in her back is constant and it rates as a 10 when she wakes up on a scale of 1 to 10, with 10 being unbearable.  (Tr. 52.)  Nordin states that medication only lowers her pain to a 7 or 8.  Nordin has not had surgery for her back and it has not been

4

discussed with her.  (Tr. 55.)  She has had a denervation,[3] which involves deadening the nerves to prevent pain in an area.  *Id.*  She last had a denervation in March and it helped for a little bit, but it was a short term fix, lasting only three or four months.  (Tr. 55.)  Nordin is only able to stand up for about 15 minutes before her back starts bothering her and can only sit for 10 minutes before she becomes uncomfortable.  (Tr. 56.)  She can only walk a block before her back starts hurting and her shin starts burning.  *Id.*  Nordin cannot bend over all of the way; she can crouch and stoop, but it is hard for her to get back up and down.  (Tr. 57.)  She can go upstairs and downstairs if there is a rail to hold onto and if she does not have anything in her hands.  *Id.*

Nordin has a primary care physician, Dr. Kelly Gage; a pain management doctor, Dr. Joe Hahn; a psychiatrist, Dr. Habib and his nurse practitioner Matt; Dr. Mormal; and a family therapist, Tammy Debrickie.  (Tr. 52-53.)  Nordin does not believe that counseling helps, because the problems that bother her, no one can change them so they "don't ever get better." (Tr. 53.)

Nordin takes medication, including Invega for bipolar disorder, Alprozolam for anxiety, Lunesta and Seroquel for sleep, Effexor for depression, generic Prilosec and Reglin for hiatal hernia[4], and Imitrex for migraines.  (Tr. 54, 271.)  Nordin's medications can cause her to get very tired, dizzy, and nauseous.  (Tr. 56.)  Nordin's hiatal hernia causes heartburn and indigestion if her medication is not taken properly, but it controls her hernia.  (Tr. 54.)  Surgery has never been recommended for the hiatal hernia.  (Tr. 56.)  Nordin gets migraine headaches once a month. (Tr. 54.)  Her migraine headaches can last for a couple of hours after she takes her medicine.  *Id.* Her migraine headaches make her head feel like her head's going to blow off, her eyes feel bad,

---

[3] Denervation is the loss of a nerve supply.  Stedman's Medical Dictionary 472 (27th ed. 2000).
[4] Hiatal hernia is a protrusion of a part of the stomach through the esophageal hiatus of the diaphragm, characterized by either the upper stomach and cardioesophageal junction sliding in and out of thorax or all or part of the stomach pushing through the diaphragm next to the gastroesophageal junction.  Stedman's Medical Dictionary 812 (27th ed. 2000).

light hurts her, and she is in severe pain.  (Tr. 54-55.)  Nordin often has bronchitis, but an antibiotic, the steroid Prednisone, and an inhaler usually take care of it.  (Tr. 57.)

Dr. Habib has prescribed several different medications for Nordin.  (Tr. 64.)  Her past medications were not effective and did not help her.  *Id.*  Her current medications seem to be the best, but they are not one hundred percent.  *Id.*  It is difficult to know because she is bipolar, and she starts to feel good and feels like she does not need to take her medication.  *Id.*  That usually occurs when she is in a manic phase.  *Id.*  She is more down than up during her manic phases.  (Tr. 65.)  She may get an energy spurt two times a month that can last from a couple of hours to a day.  (Tr. 65.)  When she is energetic, she just feels high, and then she crashes hard.  (Tr. 64.)  When she is down, she does not feel like facing the day and wants to stay in bed, because it feels safe there.  (Tr. 65.)  She thinks about giving up her youngest child for adoption every day.  (Tr. 66.)  She cries once or twice a day.  *Id.*  Some days she does not feel like life is worth living.  *Id.*  She was admitted to the hospital last spring for trying to hurt herself.  *Id.*  She was tired of hurting and feeling like a misfit.  *Id.*  She is thirty years old and cannot keep a job.  *Id.*  She feels like her kids have nothing to be proud of.  *Id.*  She does not have a lot of support or many friends.  *Id.*

Nordin has problems getting along with people because she is judgmental and feels like everybody is judging her.  (Tr. 58.)  She has a "copping attitude" because she feels that they think they are better than her.  *Id.*  She does not get into arguments with people as much now that she is older with kids.  *Id.*  She tries to walk away, but it makes her depressed.  *Id.*  She has trouble concentrating because she cannot comprehend what she is reading and it is hard for her to remember when she is reading.  (Tr. 58.)  This happens more when her bipolar is manic.  *Id.*

Nordin watches some television, but cannot watch a whole show. (Tr. 58.) She has an e-mail address, but never checks it. *Id.* She has a Facebook page, but does not "really get on it." (Tr. 59.) A typical day for Nordin includes getting up a 7:00 a.m. to remind her kids of what they need to do to prepare for school and then she goes to bed. *Id.* Then she goes to work and comes home and "peddle[s]" around the house until her fiancé comes home to help with dinner and the dishes. *Id.* After that, she sits in her bed for the remainder of the night. *Id.* She only cooks "instant" and "pre-made type stuff." (Tr. 62.) She does most of the laundry for herself and her client, but that is about it for housework. *Id.* She also shops for groceries for herself and her client. (Tr. 62-63.) She has trouble lifting groceries and can lift up to ten pounds. (Tr. 63.) If she tries to lift more than ten pounds, it strains her back and makes her back hurt. *Id.*

Nordin has very bad insomnia. (Tr. 61.) She takes Lunesta and Seroquel at night and she still does not get any sleep. *Id.* There are nights where she only gets two hours of sleep and is just tired all day. *Id.* Nordin does not shower like she used to, because it just feels like so much effort. *Id.*

### 2.    Vocational Expert's Testimony

Vocational Expert Jennifer Teshada testified as follows. Nordin only had substantial gainful activity in 2001 and 2002 and the year[5] when Nordin worked as an imaging clerk. (Tr. 69.) An imaging clerk position is classified as semiskilled light work with a specific vocational preparation[6] ("SVP") of 4. *Id.* Nordin's current position would be classified as a personal care giver and it is classified as semiskilled medium work (*id.*), but Nordin is performing the job at a light physical skill level. (Tr. 70.) Nordin can transfer her verbal record keeping skills to other jobs. *Id.*

---

[5] The transcriber noted that the year identified by Ms. Teshada was inaudible. (Tr. 69.)
[6] Specific vocational preparation is how long it generally takes to learn a job. *See Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998).

A person of the same age, education, and work experience as Nordin and can perform the full range of light work, but she is limited to occasional interaction with the public and co-workers and no transactional interaction with the public and limited to performing repetitive tasks could not work as an imaging clerk, Nordin's past work.  (Tr. 70.)  The hypothetical individual could perform Nordin's current job as she described it, but not according to the Dictionary of Occupational Titles.[7]  (Tr. 70.)  The hypothetical individual could perform other jobs as a merchandise marker and housekeeper.  (Tr. 70-71.)  If the hypothetical person missed more than two days per month consistently, employment would be precluded (Tr. 71.)  If the hypothetical person was an hour late to work two to three times per month, the person would not be able to maintain employment.  *Id.*

## B.    Medical Records

Nordin's relevant medical records are summarized as follows:

On July 6, 2006, Nordin was admitted to St. John's Mercy Medical Center's acute inpatient psychiatric unit.  (Tr. 568-601, 921-928.)  At the time of discharge on July 14, 2006, Nordin received a diagnosis of bipolar disorder, depressed versus schizoaffective disorder.  (Tr. 921.)  It was noted that, prior to admission, she had not been compliant with her medication and it was her second inpatient hospitalization.  During her hospitalization, she received individual and group therapy, psychotropic medication, medication and diagnostic education, stress and anger management therapy, relaxation therapy, and activity therapy.  (Tr. 921.)

Between August 2006 and September 2010, Nordin received mental health treatment from Dr. Asif Habib and his staff at Mid-America Psychiatric Consultants, LLC.  During her

---

[7] "The Dictionary of Occupational Title definitions are simply generic job descriptions that offer the appropriate maximum requirements for each position, rather than their range.  Not all of the jobs in every category have requirements identical to or as rigorous as those listed in the [DOT]."  *Jones v. Astrue*, 619 F.3d 963, 978 (8th Cir. 2010).

treatment there, she was consistently diagnosed with bipolar disorder- mixed type, anxiety, PTSD, and cocaine, marijuana, and alcohol dependence.  (Tr. 608-11, 684-696, 969-996.)  On April 2, 2010, Nordin was admitted to SSM St. Clare Hospital for a suicide attempt by overdose with medication and respiratory failure.  (Tr. 884-919.)  Her condition stabilized and she was able to be discharged the next day.  (Tr. 887.)  Dr. William Irvin Sr., diagnosed Nordin at discharge with drug overdose with bipolar disorder and depression.[8]  (Tr. 892.)  Nordin was admitted to St. John's Mercy Medical Center in May 2010 due to suicidal ideation.  (Tr. 929-930.)  She was diagnosed with bipolar disorder, depressed type at the time of admission.  (Tr. 930.)

On September 10, 2008, Nordin visited Dr. Traci White at Barnes Jewish Hospital for low back pain and pain management.  (Tr. 762-766).  Nordin reported that the pain interfered with her ability to perform household chores, work, sleep, and do any physical exercise.  (Tr. 762.)  A previous MRI of her lumbar spine showed mild space desiccation and narrowing at L5-S1, mild foraminal narrowing at L5-S1 bilaterally, and facet osteoarthritis at L4-5 and L5-S1.  (Tr. 762.)  A physical examination revealed a normal, slow gait, with motor strength of 5/5.  (Tr. 763.)  Upon examination, Dr. White noted that Nordin had tenderness at the lumbosacral region and that range of motion of the lumbar spine was decreased.  (Tr. 763.)  Dr. White also noted that Nordin had normal range of motion and muscle strength in her lower extremities.  (Tr. 764.)  Nordin was scheduled for a L5-S1 selective root injection and given pain medication.  (Tr. 764.)  Nordin received the nerve root injection on September 19, 2008.  (Tr. 772-773.)  Nordin received additional injections in October 2008 and February 2009.  (Tr. 778-779, 782-83.)

---

[8] It was noted by another physician, Dr. P. Kulikowski that Dr. Irvin did not consider this a "true suicide attempt." (Tr. 887.)  It appears from Dr. Irving's notes that he was referencing a prior overdose by Nordin as a "call for help and not suicidal."  (Tr. 891.)

On September 11, 2008, Judith McGhee, Ph.D., completed a Mental RFC Assessment and Psychiatric Review Technique regarding Nordin.  (Tr. 697-711.)  In the RFC Assessment, Dr. McGhee determined that Nordin was moderately limited in the ability to maintain attention and concentration for extended periods.  (Tr. 697.)  Dr. McGhee found Nordin to be markedly limited in the ability to understand,  remember, and carry out detailed instructions.  (Tr. 697.)  Dr. McGhee opined that Nordin retained the capacity for simple, repetitive work with verbal directions and that limited social contact would be less stressful for Nordin.  (Tr. 699.)  In the Psychiatric Review Technique, Dr. McGhee determined that Nordin had bipolar disorder, major depressive disorder, anxiety disorder, and PTSD, and a history of borderline personality disorder. (Tr. 703-704.)

Victor Washburn conducted a Physical RFC Assessment regarding Nordin on September 16, 2008.  (Tr. 712-717.)  Mr. Washburn found that Nordin was limited to occasionally lifting and/or carrying 50 pounds; frequently lifting and/or carrying 25 pounds; standing, walking, or sitting six hours in an eight hour day.  (Tr. 713.)  He determined that Nordin did not have any postural, manipulative, visual, communicative, or environmental limitations.   (Tr. 714-716.) Washburn noted that Nordin really only limited herself psychologically and that Nordin's alleged limits were credible.  (Tr. 717.)

Nordin received pain management treatment from Dr. Thomas Johans between August 2009 and June 2010.  (Tr. 931-967.)  During her first visit on August 24, 2009, Nordin reported that she has axial, weight bearing, mechanical pain that did not radiate and was negative on a neurological examination.  (Tr. 965.)  Dr. Johans diagnosed Nordin with degenerative joint (facet) disease in the sacroiliac joints.  (Tr. 965.)  On September 11, 2009, Nordin reported moderate lower back pain.  (Tr. 958.)  Because she admitted drug use, Dr. Johans determined

that he would not give her narcotics for the pain, but scheduled Nordin for a fluoroscopically guided right and left sacroiliac intra-articular steroid injection.  (Tr. 959.)  The fluoroscopically guided sacroiliac joint intra-articular steroid injection was performed on October 8, 2009.  (Tr. 957.)  Nordin reported relief for two weeks after the initial injection, including being able to twist, bear weight, and sit better.  (Tr. 952.)  Afterwards the pain returned and was minimally improved, good but "not quite good enough."   (Tr. 952.)   Nordin received a second fluoroscopically guided sacroiliac joint intra-articular steroid injection on November 13, 2009.  (Tr. 952-954.)  Nordin's pain was also being treated with long term oral/patch narcotic therapy, non-steroidal anti-inflammatory drugs, antidepressants, and short term narcotics.  (Tr. 952.)  Nordin returned for a visit on December 11, 2009.  (Tr. 950-951.)  Dr. Johans noted that there was a discrepancy between what Nordin stated and what she wrote down regarding her pain.  (Tr. 951.)  For example, she told him that she is much better since seeing him and her pain decreased from 8 out of 10 to 5 out of 10 consistently.  (Tr. 951.)  She also told him that her pain is miserable and she was having a lot of pain.  (Tr. 951.)  Dr. Johans tried to get Nordin to clarify, however he did not believe that she understood the concept.  (Tr. 951.) Nevertheless, she seemed to be progressing.  (Tr. 951.)   A third fluoroscopically guided sacroiliac joint intra-articular steroid injection was given to Nordin on January 8, 2010.  (Tr. 949.)  On January 22, 2010, Dr. Johans suggested a sacroiliac joint denervation by radio frequency. (Tr. 943.)  Dr. Johans performed a sacral medial branch block to ensure that the sacroiliac joint was the source of the low back pain in preparation for the denervation.  (Tr. 944-945.)  On March 26, 2010, Dr. Johans performed the fluoroscopically guided right and left sacroiliac joint denervation by radiofrequency.  (Tr. 938-939.)  On June 14, 2010, Nordin reported that the sacroiliac joint denervation took her low back and buttock pain away, however she fell a few weeks prior and

11

developed intense pain in the left side of her shoulder blade and upper back.  (Tr. 932)  Nordin described the pain as aching, cramping spastic, burning, throbbing, and explosive.  (Tr. 932.)  Nordin reported she had not come sooner, because she had been hospitalized due to a nervous breakdown.  (Tr. 932.)  Dr. Johans performed a trigger point injection to relieve Nordin's pain. (Tr. 935.)

On October 9, 2010, Dr. Gage completed an assessment for Nordin's social security disability claim.  (Tr. 1011.)  Dr. Gage wrote that Nordin's current diagnoses were bipolar disorder, insomnia, and post-traumatic stress disorder.  *Id.*  Dr. Gage stated that Nordin is not able to deal with stress by her own account and is under the care of a psychologist and psychiatrist.  *Id.*  Dr. Gage also opined that while Nordin would have no issues relating to co-workers and supervisors, she misses work frequently with illness.  *Id.*  She indicated that Nordin would be unable to perform sustained full-time employment at the sedentary level at that time. *Id.*

Upon a request from the ALJ in this matter, Dr. James Reid reviewed Nordin's medical records and completed a vocational interrogatory regarding Nordin's disability claim.  (Tr. 326-344.)  Dr. Reid reviewed Nordin's previous medical diagnoses of bipolar disorder, major depressive disorder, generalized anxiety disorder, and PTSD.  (Tr. 334.)  He opined that there was no objective evidence that Nordin met the criteria for PTSD as listed in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision ("DSM-IV").  (Tr. 334.)  Regarding the other diagnoses, Dr. Reid found that Nordin's "dramatic" behavior of suicide attempts and conflicts with family members were more consistent with borderline personality disorder.  (Tr. 334.)  He also opined that substantial components of her symptoms were substance induced.  (Tr. 336.)  Dr. Reid determined that Nordin was moderately limited in

understanding, remembering, and carrying out complex instructions and the ability to make judgments on complex work-related decisions.  (Tr. 329.)  He also found that she was mildly limited in interacting appropriately with the public, supervisors, and co-workers.  (Tr. 330.)  He determined that she was mildly limited in social functioning and maintaining concentration, persistence, or pace.  (Tr. 337.)  Dr. Reid opined that Nordin would be unable to manage benefits in her own best interest due to drugs and alcohol.  (Tr. 331.)  Dr. Reid concluded that Nordin appears to be capable of simple, routine tasks and would do best in work situations where she has minimal contact with the public, coworkers, and supervisors.  (Tr. 344.)  He also concluded that if Nordin was clean and sober, she would be able to handle more complex tasks.  (Tr. 344.)

## IV.    Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ."  *Id.*  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  *Page v. Astrue*, 484

F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[9]  20 C.F.R. §§ 416.920(e), 404.1520(e).  At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC").  *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  *Id.*; 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.   20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the

_____

[9] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."  *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

claimant will be found to be disabled. *Id.; see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson*

*v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)).  Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently.  *Krogmeier*, 294 F.3d at 1022.

## V.    Discussion

Nordin asserts three errors on appeal.  First, Nordin asserts that the ALJ failed to find that her degenerative sacroiliac disease was a severe impairment.  Second, Nordin contends that the ALJ also failed to consider the effects of any non-severe impairments, specifically Nordin's obesity.  Finally, Nordin asserts that the ALJ gave great weight to a medical expert while affording little weight to Nordin's own treating physicians.  The Commissioner contends that the ALJ properly considered the combined effects of Nordin's impairments including back pain and properly considered the medical opinion evidence.

### A.    Severe Impairment Determination

Nordin contends that the ALJ should have considered her degenerative sacroiliac disease as a severe impairment.  To be considered severe, an impairment must *significantly* limit a claimant's ability to do basic work activities.  *See* 20 C.F.R § 404.1520(c).  Step two [of the five-step] evaluation states that a claimant is not disabled if his impairments are not 'severe.'"  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Simmons v. Massanari,* 264 F.3d 751, 754; 20 C.F.R. § 416.920(a)(4)).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Id.* at 707.  "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two."  *Id.* (citing *Page v. Astrue,* 484 F.3d at 1043).  "It is the claimant's burden to establish that his impairment or combination of impairments are severe.  *Id.* (citing *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th

Cir.2000)).  "Severity is not an onerous requirement for the claimant to meet, . . . but it is also not a toothless standard."  *Id.* at 708.

In this case, the ALJ stated that Nordin's low back pain was a non-severe impairment based on treatment notes, which show improvement in Nordin's lower back pain.  (Tr. 23.)  The Court finds that substantial evidence on the record as a whole supports that ALJ's determination that Nordin's back pain was a non-severe impairment.  There is no evidence in the medical record that Nordin's back pain had more than a minimal effect on her work.  First, although Nordin did experience back pain over a long period of time, her medical records and her testimony demonstrates that the medical treatment, including the injections provided her relief for weeks and months at a time.  (Tr. 55, 762-783, 931-967.)  Second, Nordin's activities of daily living demonstrated that her lower back pain did not prevent her from cooking, working, doing laundry, shopping for groceries, and taking care of her kids.  (Tr. 59-63.)  Third, most of the impairments that Nordin alleges affect her working ability and daily functioning are mental impairments.  (Tr. 44-51, 57-63.)  In fact, in Nordin's Disability Report, she did not list her lower back pain as a condition that limits her ability to work.  (Tr. 265 (citing bipolar disorder, anxiety disorder, depression, ptsd, and sleep but not back pain as limiting her ability to work)).  Finally, the ALJ accounted for Nordin's lower back pain with an RFC for light work, which does not require lifting more than ten pounds frequently, which Nordin stated was the limit that she could lift without any pain.  *See* 20 C.F.R. § 404.1567(b); (Tr. 63).  Therefore, the ALJ's decision to consider Nordin's lower back pain as a non-severe impairment is supported by substantial evidence in the record as a whole.

**B.     Effect of Obesity on Nordin's Ability to Work**

17

Nordin states that the ALJ erred in failing to fully consider the impact of Nordin's obesity on her ability to work.  According to Social Security Ruling ("SSR") 02-1p, "[o]besity can cause limitation of function.  2002 WL 34686281 at *5.  "Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. . . . [Each case is evaluated] based on the information in the case record."  *Id.* at *6.  "[S]omeone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone.  *Id.*  "An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.  Individuals with obesity may have problems with the ability to sustain a function over time."  *Id.*  It should be explained how a conclusion was reached on whether obesity caused any physical or mental limitations.  *Id.* at 7.  Nordin states that the ALJ does not explain how she reached her conclusion and failed to include restrictions in exposure to heat, ability to stand for long periods of time, and any non-exertional impairments as a result of Nordin's obesity.   The ALJ's decision mentions Nordin's obesity and a recommendation for weight loss in the opinion.  (Tr. 23.)

"[O]besity can impose significant work related limitation[s]," however, the Court finds that the ALJ's failure to discuss the effects of obesity on Nordin's ability to work as harmless error.  First, there is no evidence in Nordin's medical records that indicates that any physician placed physical limitations on Nordin's ability to perform work-related functions due to her obesity.  *McNamara v. Astrue*, 590 F.3d 607, 611 (8th Cir. 2010).  Second, Nordin's own Function Report fails to identify any limitations caused by obesity.  (Tr. 227-234.)  Nordin failed to identify any limitations lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, or stair climbing.  (Tr. 232.)  Nordin stated that her illness and conditions affected her

talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others.  (Tr. 232.)  Third, Nordin did not testify about her obesity affecting her ability to work.  (Tr. 51-52.)  The RFC also limited Nordin to light work.  (Tr. 21.)  Therefore, it was not reversible error for the ALJ's opinion to omit specific discussion of Nordin's obesity. *McNamara*, 590 F.3d at 612 (not reversible error for ALJ to omit specific discussion of obesity where neither the medical records or claimant's testimony demonstrated obesity resulted in additional work-related limitations).

### C.   Medical Opinion Evidence

Nordin contends that the ALJ improperly gave greater weight to a non-examining medical expert and gave less weight to her treating physicians.  Here, following Nordin's administrative hearing, the ALJ posed interrogatories to psychologist Dr. James D. Reid, who concluded that Nordin did not meet or equal a listed impairment; she had generally mild to moderate work-related limitations; no restrictions of activities of daily living; mild difficulties maintaining social functioning and maintaining concentration, persistence, and pace; and appeared capable of performing at least simple, routine activities in work situations involving minimal contact with the public, coworkers, and supervisors.  (Tr. 329-44.)

In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record."  20 C.F.R. § 404.1527(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  "It

is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians."  *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).   "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole."  *Id.*

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it.  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).  A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).  A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937.  When given controlling weight, the ALJ defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions.  20 C.F.R. § 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005).   "A medical source opinion that an applicant is 'disabled' or 'unable to work,' however involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

In this case, the Court finds that the ALJ properly gave controlling weight to Dr. Reid's opinions instead of Dr. Habib's and Dr. Gage's opinions.  First, the ALJ properly discounted Dr. Habib's opinion that Nordin was disabled because Dr. Reid took into consideration the entire documentary file and Dr. Habib only had information from his sessions with Nordin.   In addition, other evidence in the record supported Dr. Reid's opinion and outweighed the opinions

of Dr. Habib and Dr. Gage.  Although Dr. Habib diagnosed Nordin with bipolar disorder- mixed type, anxiety, PTSD, and cocaine, marijuana, and alcohol dependence (Tr. 608-11, 684-696, 969-996), the ALJ and Dr. Reid found that Dr. Habib's treatment notes did not reflect this diagnosis. Dr. Habib's treatment notes do not describe significant manic or depressive episodes in the claimant's behavior, particularly any episodes of decomposition or extended periods of deterioration.  (Tr. 338.)  It is consistently noted that Nordin is alert and oriented, well groomed and has good long-term memory and normal short-term memory. (*Id.*)   Likewise, her reasoning is described as normal.  (*Id.*)  Nordin did not report activities reflecting or describing mood swings and, on many occasions, including her last session with Dr. Habib, she reported that she was "doing well" and her depression was stable.  (Tr. 969.)  With respect to Dr. Gage, the ALJ found that her opinion was limited because her treatment notes only mention a "chronic medical condition—bipolar disorder unspecific" and it does not indicate that Dr. Gage discussed mental disorders with Nordin.  (Tr. 24.)  Moreover, to the extent that Dr. Gage provides a psychological evaluation of Nordin, such evaluation is outside of Dr. Gage's expertise and the ALJ did not err when she disregarded her opinion for this reason. *See Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010).    In summary, the Court finds that the ALJ properly gave more weight to the opinions of Dr. Reid rather than her treating physicians because Dr. Reid's conclusions, although not based upon his own observations, are supported by the record as a whole, particularly Dr. Habib's and Dr. Gage's treatment notes.

Second, the ALJ found that the medical evidence in the record shows that Nordin's disorders were not severe enough to prevent her from engaging in all work activity; rather, Nordin's inability to work was the result of several factors, such as that she did not see her doctor regularly, used drugs, and would sometimes fail to take her medication.  (Tr. 23-24.)  The

ALJ noted that Dr. Habib's treatment notes reflected that Nordin continued to use illicit drugs in the years after the alleged disability onset date, which indicated a continued disregard of the full consequences of her actions and the impact on her mental status.  (Tr. 23-24). The ALJ's review of Dr. Habib's treatment notes and the medical records reflected that:

- On July 6, 2006, she admitted smoking marijuana two days before her ER visit

- On October 17, 2006, the claimant admitted marijuana use

- On November 7, 2006, she relapsed into drinking and smoking crack

- On December 5, 2006, she had gotten into a fight with her brother because she smoked pot with her niece

- On September 23, 2008, she admitted that she was still using marijuana periodically

- On March 31, 2009, she described her marijuana use as episodic

- On April 28, 2009, she stated that she had been off marijuana for a couple of weeks

- On July 2, 2010, she tested positive for benzodiazepines and cannabinoids.

(Tr. 23.)  Further, there is no evidence that Nordin's failure to comply with her medications or visit her doctor more regularly was a manifestation of her purported bipolar disorder.  *See Wildman*, 596 F.3d at 965; *cf. Pate-Fires v. Astrue*, 564 F.3d 935, 946 (8th Cir. 2009).  In fact, Nordin testified that she stopped taking her medicine when she felt better (Tr. 64), rather than because of some mental impairment.  *See Wildman*, 596 F.3d at 966 ("there is little or no evidence expressly linking [claimant's] mental limitations to such repeated noncompliance").  Likewise, the ALJ determined that the medical evidence showed that Nordin was stable and doing well when on her medications, including the most recent records.  (Tr. 25.)  As previously stated, Dr. Habib's assessments consistently reported throughout Nordin's treatment that her behavior and mood were calm and cooperative; her affect was full; her thought processes were

coherent and goal oriented; her memory was intact; and her insight, judgment, concentration, and attention span were fair.  (Tr. 24.)   All of these findings are consistent with Dr. Reid's assessment.   Therefore, the Court finds that substantial evidence on the record as a whole supports the ALJ's determination of the medical opinion evidence.

**VI.**     **Conclusion**

Based on the foregoing, the Court will affirm the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice.  A separate Judgment will accompany this Order.

Dated this 29th day of March, 2013.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE